### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                        No.  CR-04-195 MV

RICARDO RODRIGUEZ-LOPEZ,

    Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Ricardo Rodriguez-Lopez's Motion to Suppress **[Doc. No. 15]**.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

### BACKGROUND

Defendant was traveling on a Greyhound bus on November 20, 2003, at approximately 1:40 a.m., when the bus stopped for a routine immigration inspection at a fixed border patrol checkpoint north of Las Cruces, New Mexico.  Border patrol agent Rene Chavez boarded the bus, in uniform, with his border patrol badge showing.  Agent Chavez also was wearing his duty belt, which held a holstered gun, extra rounds, a radio, handcuffs, and pepper spray.  Agent Chavez identified himself, in English and Spanish, as a border patrol agent and stated that he was going to conduct an immigration inspection.  Agent Chavez indicated that if anyone on the bus was not a United States citizen, that person should have his or her immigration papers available for review.  Defendant testified that although he was seated in the front half of the bus, he did not hear Agent Chavez make any such statements.

Agent Chavez proceeded to walk down the aisle of the bus--which he described as a narrow space wide enough only for one person to stand--and question each passenger individually. At this point, Defendant and Agent Chavez offer conflicting testimony as to what transpired.

Defendant testified that approximately one minute after Agent Chavez boarded the bus and began questioning him, a second agent boarded and remained standing by the front door of the bus. Agent Chavez, however, testified that he was the only agent that boarded the bus.

As Agent Chavez approached Defendant, Agent Chavez noticed that Defendant was wearing a thick coat that in his opinion was excessive for the weather at the time. Agent Chavez asked Defendant to state his citizenship and Defendant responded by handing the agent either his driver's license or an identification card. Because Defendant did not reply to Agent Chavez's question verbally, Agent Chavez asked Defendant where Defendant had been born. Defendant informed Agent Chavez that he was a naturalized citizen. According to Agent Chavez, Defendant "was still holding up the ID with his hand shaking tremendously, and very wide-eyed . . . his eyes were bulging out, [it was as] if he was really sweating, perspiring." Agent Chavez interpreted these facts--*i.e.*, the "beads of sweat, the shaking of the hand, and the wide-eyedness"--as reflecting "a very nervous demeanor" and indicating that "something just wasn't right" because in Agent Chavez's experience this was "[u]nusual" behavior for a passenger.

As a result of Defendant's appearance and the fact "that [Defendant] didn't answer any of [Agent Chavez's] questions, . . . [Agent Chavez] proceeded to ask [Defendant] if . . . [Defendant] would allow [Agent Chavez] to conduct further records [checks] of [Defendant's] immigration status, to verify his Naturalization." Defendant nodded his assent and stated "yes." Agent

Chavez testified that he did not inform Defendant that he would conduct this additional investigation outside of the bus. Rather, consistent with his usual practice, Agent Chavez continued to question the remaining passengers and, on his way back up the aisle, returned to Defendant and asked if Defendant would accompany him to the checkpoint building. Defendant said, "okay," and Agent Chavez asked Defendant to follow him off of the bus. Defendant complied.

Defendant was the only passenger asked to deboard the bus. At no point did Agent Chavez inform Defendant that Defendant had the option of remaining on the bus while the agent went to the checkpoint station and conducted the additional immigration check. Agent Chavez testified that he used an even, conversational tone of voice throughout his exchange with Defendant, that he never reached for or brandished his weapon, and that he never touched Defendant at any time.

In contrast, Defendant testified that when Agent Chavez initially approached him, Defendant stated that he was American. Agent Chavez then asked Defendant where he had been born. Defendant responded by handing Agent Chavez his driver's license and stating that he was a naturalized citizen. Defendant further testified that, as he sat on the bus with his wallet open, Agent Chavez looked down at him and asked him about an item in his wallet. Defendant explained that the item was his Social Security Card. Agent Chavez asked Defendant if he could look at the card, and Defendant complied. Agent Chavez then asked Defendant if Defendant had any other documentation, and Defendant mentioned his Texas Identification Card. Agent Chavez, however, did not take the card. Instead, Agent Chavez returned the license and Social Security Card to Defendant and informed Defendant that he needed to "verify [Defendant's] citizenship,

[and] that [Defendant] needed to get off the bus for his protection." Defendant followed Agent Chavez off of the bus. Throughout this exchange, Agent Chavez was standing approximately six inches away from Defendant, above him, while Defendant remained seated. Defendant also testified, contrary to Agent Chavez, that he was not feeling or exhibiting any signs of nervousness while he was on the bus or after he disembarked the bus, including the sweating, shaking, and wide-eyedness described by Agent Chavez.

After leaving the bus, Agent Chavez asked Defendant to accompany him to the station building across the street. Agent Chavez testified that he and Defendant were standing side by side when he asked Defendant "for his safety and the fellow officers' safety, if [Defendant] would allow [the agent] to do a . . . cursory pat-down of [Defendant's] outer clothing" before they entered the building. Agent Chavez stated that Defendant nodded his consent. According to Agent Chavez, both he and Defendant remained in view of any passengers who might have been looking out of the bus windows during this encounter. At some point before Agent Chavez actually searched Defendant, another border patrol agent appeared and stood nearby as backup.

Agent Chavez testified that after instructing Defendant to place his hands behind his head and stand with his legs apart, Agent Chavez conducted a pat-down search on Defendant and felt some hard objects under Defendant's armpits. Agent Chavez suspected the objects might be drugs because in his experience individuals frequently package and carry narcotics on their bodies under their clothing. Agent Chavez claimed that he twice asked Defendant what these items were and that Defendant did not respond. Agent Chavez asked Defendant if he could view the objects and Defendant nodded yes. Agent Chavez moved Defendant's jacket aside, lifted Defendant's

-4-

shirt, and saw two bundles taped to each side of Defendant's body. Agent Chavez handcuffed Defendant and escorted Defendant into the station building.

Defendant contends that he never consented to the pat-down search. Defendant stated that after deboarding the bus, he and Agent Chavez walked towards the station building. As they neared, Agent Chavez "asked me that he needed to search me [sic], if I had--if he had my permission to search me, for his protection." Defendant testified that he never nodded his head. Rather, Defendant "simply just put [his] head down, [and] didn't say a word." Agent Chavez then allegedly guided Defendant to the wall of the station building where, after placing his hands on Defendant's back, he handcuffed and escorted Defendant inside.

Agents then removed the bundles from Defendant's body, subjecting the items first to a dog sniff and then to a field test for narcotics. The substances in the bundles tested positive for cocaine. At some point after bringing Defendant into the building and before removing the bundles, Defendant was presented with a written form listing his *Miranda* rights. Agent Chavez testified that when Defendant was asked if he understood those rights, Defendant responded affirmatively and signed the form acknowledging his comprehension. Agent Chavez also stated that although he explained to Defendant what a waiver of his rights was, Defendant did not sign the waiver. Agent Chavez also indicated that Defendant did not request counsel or indicate that he did not want to speak with the officers. Defendant was placed in a holding cell while an agent from the Drug Enforcement Agency was called and the case was transferred to that agency.

Defendant seeks suppression of the evidence obtained as a result of the search and seizure as well as any statements he made. For the reasons set forth herein, the Court denies Defendant's motion.

### A.     Immigration inspection

First, Defendant argues that he unlawfully was seized when Agent Chavez began questioning him about his immigration status because the questioning amounted to an investigative detention unsupported by any particularized suspicion.  The law is clear, however, that this encounter was valid at least until the time Defendant was asked to deboard the bus.  Government officials conducting routine immigration inspections at permanent checkpoints do not need to have individualized suspicion briefly to question the driver of a vehicle and its passengers.  *See United States v. Ray*, 973 F.2d 840, 842 (10th Cir. 1992).  Officials also may "selectively refer" the vehicle and its occupants "to a secondary inspection area for further questioning without individualized suspicion."  *Id.*  These principles apply equally to commercial buses and private vehicles.  "When a bus enters [a permanent] checkpoint and is referred to the secondary inspection location, border patrol agents are permitted to board the bus, question its passengers regarding citizenship and immigration status, make a brief visual inspection of their surroundings, and question the passengers regarding suspicious circumstances."  *United States v. Hernandez*, 7 F.3d 944, 946 (10th Cir. 1993).  Accordingly, Agent Chavez's conduct in boarding the bus and questioning the passengers did not exceed conduct which is permissible under *Hernandez*.  The Court therefore finds that Defendant was not improperly seized during this initial encounter.[1]

### B.     Removal from bus

---

[1] Defendant also seeks suppression of any statements he made to the investigating officers under the theory that these admissions were fruits of an illegal detention.  Notably, Defendant does not argue that his statements should be excluded as a result of some *Miranda* violation.  Because the Court has found no infirmity in the stop of the bus and the questioning of its passengers, the Court denies Defendant's motion to suppress his statements.

Defendant next argues that he did not consent to disembarking the bus and that Agent Chavez lacked the reasonable suspicion necessary to justify ordering Defendant off of the bus without his consent. The Tenth Circuit has stated that notwithstanding the discretion afforded to border patrol agents "the overall detention cannot exceed a routine checkpoint stop if probable cause, consent or reasonable suspicion does not exist." *United States v. Rascon-Ortiz*, 994 F.2d 749, 753 (10th Cir. 1993).[2] The Court need not address whether reasonable suspicion existed in the instant case because Defendant validly consented to disembarking the bus.

In determining whether a police-citizen encounter is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quotations omitted). "Any analysis approaching a per se rule in this as in other Fourth Amendment contexts is prohibited." *United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir.

---

[2]In an unpublished opinion, the Tenth Circuit has stated that if a person is asked to deboard a bus during an immigration inspection at a permanent checkpoint, the encounter is no longer a routine checkpoint stop and has become an investigative detention. In *United States v. Ramirez*, No. 97-2347, 1999 WL 100891, **2 n.1 (10th Cir. Mar. 1, 1999), the appellate court noted as follows:

> In the absence of consent, [border patrol agent] Davila would have needed a reasonable suspicion of criminal activity to support this investigative detention. We reject the suggestion that absent consent, "suspicious circumstances" would suffice to justify Ramirez's removal from the bus. While a motorist may be referred to a secondary checkpoint based on suspicious circumstances, or even in the absence of suspicious circumstances, the degree of intrusion that such a referral entails is much less than that experienced by a bus passenger who is removed from a bus to a separate building for interrogation.

*Id.* (citation omitted).

2000). Courts must "tak[e] into account all of the circumstances surrounding the encounter" in deciding whether the interaction was in fact consensual. *Id.*

Defendant testified that after Agent Chavez returned Defendant's identification, "[Agent Chavez] turned back and . . . asked me that I needed to [sic]--he needed to verify my citizenship, that I needed to get off the bus for his protection." Defendant explained that he followed Chavez off of the bus "[b]ecause [Agent Chavez] asked me[ and] I follow orders, you know, I'm brought up to where [sic] a State official, or city official, government official, you know, asks me to follow orders, I follow orders." Whether Defendant *personally* felt he could not have refused Agent Chavez, however, has no bearing on the voluntariness inquiry. *See Hatheway v. Thies*, 335 F.3d 1199, 1206 (10th Cir. 2003) ("[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis"). Instead, courts look to the following objective factors in making this determination:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*Id.* (quoting *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996)).

In the case at bar, although Defendant testified that he saw a second agent standing in the bus doorway while he was being questioned by Agent Chavez, Defendant did not argue or provide any reason for the Court to believe that the latter officer's presence contributed to a coercive environment. Defendant also did not dispute Agent Chavez's testimony that he never brandished or touched his gun, that he never made physical contact with Defendant, or that he

spoke to Defendant in an even and conversational tone of voice. In addition, by Defendant's own account, Agent Chavez did not retain Defendant's driver's license or social security card for an extended period of time. Rather, Agent Chavez returned these items to Defendant while the two men still were on the bus. Finally, although the exact numbers are disputed, at least some members of the public were seated on the bus in the vicinity of the encounter. Defendant maintains that there were four passengers including himself, while Agent Chavez indicates that although he cannot recollect the precise number there may have been anywhere from ten to twenty passengers.

At most, two factors militate towards a finding of nonconsensuality: the fact that the exchange took place in a small space and the fact that Agent Chavez asked Defendant to deboard the bus. Although the encounter took place in the close quarters of a bus with Agent Chavez leaning over Defendant, this factor alone does not render Defendant's consent to disembark the bus involuntary. *See Florida v. Bostick*, 501 U.S. 435, 435-36 (1991). Furthermore, even if the Court considers this factor in conjunction with Agent Chavez's request that Defendant follow him off of the bus, the totality of the circumstances weigh in favor of finding the exchange consensual and Defendant's assent voluntary.

### C.     Pat-down search

Defendant contends that the pat-down search was unlawful because (1) he did not consent to the search and (2) under the circumstances, the agents had no reason to believe that Defendant was armed and dangerous, which is a necessary prerequisite to justify an unconsensual pat-down search. The Government argues that Defendant did in fact validly agree to the search.

"When the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given . . . ." *United States v. Flores*, 48 F.3d 467, 468 (10th Cir. 1995). In particular, "the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir. 1993). The voluntariness of consent is a question of fact to be determined from the totality of all the circumstances. *See Schneckcloth v. Bustamente*, 412 U.S. 218, 227 (1973). "As a general rule, [the Tenth Circuit has] found consent voluntary where there is no evidence of coercion and the testimony establishes consent was freely given." *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993) (citing inter alia *United States v. Guglielmo*, 834 F.2d 866, 866 (10th Cir. 1987) (testimony of arresting officer and of DEA agent involved after arrest established voluntariness of defendant's consent to search); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (consent found valid where "[n]o threat, promise or force was used to obtain the consent" and defendant did not object while officer searched vehicle in his presence)).

Agent Chavez testified that Defendant nodded when he asked Defendant for permission to conduct the pat-down search. Although Defendant stated that he merely lowered his head and that he did not make any motion signaling consent, Agent Chavez was the more credible witness. Given Agent Chavez's testimony and the lack of any threat or promise made at the time of Agent Chavez's request, the Court finds that Defendant did in fact communicate his consent to the pat-down search clearly and voluntarily. Accordingly, the Court denies Defendant's motion to suppress on the grounds of an unlawful search.

**IT IS THEREFORE ORDERED** that Defendant Ricardo Rodriguez-Lopez's Motion to Suppress **[Doc. No. 15]** is hereby **DENIED**.

Dated this 19th day of August, 2004.

MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Gregory Wormuth


Attorney for Defendant:
Kurt J. Mayer